# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE** |
| | **:** | |
| **NIGEL EDWARDS,** | **:** | **NO. 1:10-CR-521-07-TCB/AJB** |
| | **:** | |
| **Defendant.** | **:** | |

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b). Let the same be filed and a copy of the R&R, together with a copy of this Order, shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary

hearing for review by the District Court. Failure to object in accordance with this rule waives a party's right to review. FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this _2d_ day of _February_, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**UNITED STATES OF AMERICA** :
                      :
       **v.**             :       **CRIMINAL ACTION FILE**
                      :
**NIGEL EDWARDS,**        :       **NO. 1:10-CR-521-07-TCB/AJB**
                      :
        **Defendant.**     :

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Currently before the Court is Defendant Nigel Edwards's "Motion to Suppress Intercepted Communications Pursuant to Title III" ("motion to suppress"). [Doc. 152]. For the reasons below, the undersigned **RECOMMENDS** that Edwards's request for an evidentiary hearing be **DENIED**, and that his motion to suppress be **DENIED** as to Target Telephone 3, **DENIED AS WITHDRAWN** as to Target Telephone 8, and **DENIED** as to Target Telephone 9. [Doc. 152].

## I.     Target Telephone 3 – Necessity Requirement

### A.     Facts

In his affidavit in support of a second extension application for a wiretap for Target Telephones 3 ("TT3") and 4 in this case, Special Agent ("SA") Dixon of the Drug Enforcement Administration ("DEA") discussed among other things the

investigation's objectives, prior wiretap applications, the basis for probable cause, the continued use of the target telephones, the need for wiretap interceptions, and the utility of alternative investigative techniques. (SA Dixon's May 26, 2010, Second Extension Aff. ("SA Dixon's Aff.") *passim*).

According to SA Dixon, the goal of the investigation was to "disrupt and dismantle the instant drug trafficking organization" ("DTO"). (*Id.* at 9). He noted four previous wiretap applications and orders, dated February 17, March 29, April 16, and April 28, 2010, with only the latter two pertaining to Target Telephone 3. (*Id.* at 10-11).

With respect to probable cause, SA Dixon noted that the DEA was investigating an Atlanta-based DTO that was believed to be responsible for importing and distributing large amounts of marijuana and MDMA from Jamaica into the Atlanta metropolitan area. (*Id.* at 12). SA Dixon discussed an investigation by the Department of Homeland Security of a Customs and Border Protection officer believed to have used his law-enforcement position to facilitate the drug-trafficking activities of the named interceptees, including Edwards. (*Id.*).

2

As part of his affidavit, SA Dixon also discussed three intercepted calls on Target Telephone 3 ("TT3") that had been obtained following the issuance of the first continuation order. (*Id.* at 14-15).

Finally, SA Dixon discussed the need for the wiretap interceptions and the utility of alternative investigative techniques. SA Dixon noted the following: (1) although agents had identified certain residences associated with members of the DTO, agents had not been able to determine how those locations were utilized; (2) simply arresting the named interceptees against whom a prosecutable case could be made would likely only cause a short delay in distribution, as sources of supply and managers of the DTO would likely find a new local distribution cell; (3) the goal of the investigation was not only to build a prosecutable case against members of the DTO in Atlanta but also those members in other parts of the United States and potentially Jamaica; and (4) the interceptions should provide critical information regarding the individuals and methods of the DTO. (*Id.* at 17-18). SA Dixon then explained at length why toll and cell-site information; physical surveillance; grand-jury subpoenas; use of confidential informants, cooperating sources, and undercover agents; consensual monitoring; interviewing witnesses or the named interceptees; use of search warrants, consent

searches, and trash pulls; and seizures and arrests would not be appropriate or adequate to achieve the goals of the investigation. (*Id.* at 21-44).

## B. Arguments of the Parties

In his opening brief, Edwards first notes that in *United States. v. Giordano*, 416 U.S. 505 (1974), the Supreme Court acknowledged the additional showing required for extension applications by 18 U.S.C. § 2518(1)(f): "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." [Doc. 152 at 5]. Second, Edwards contends that rather than explaining why the continuation of the wiretap was necessary, SA Dixon merely copied, pasted, and reorganized into his affidavit the paragraphs from other agents' affidavits submitted with previous applications for wiretaps, and that there is no additional information as to why the second continuation for TT3 is necessary to the investigation. [*Id.* at 6]. Third, according to Edwards, in other sections of SA Dixon's affidavit, he accurately recites details of three conversations, but he fails to explain why the contents of the other 2,983 sessions provided no relevant information or why additional information would be obtained during the extension. [*Id.*]. Fourth, Edwards argues that while the government attempts to skirt the necessity requirement by simply noting the agents' conclusions regarding whether traditional investigative techniques

4

will suffice to expose the crime, the requisite necessity cannot be shown by conclusory statements that normal techniques would not be productive – the affiant cannot rely on boilerplate recitations of difficulties gathering evidence in place of specific factual allegations explaining why a normal investigation would not succeed. [*Id.* at 6-7]. Finally, Edwards observes that because the application process for a wiretap is non-adversarial, this is the first opportunity to challenge the application. [*Id.* at 7]. Edwards notes that when Judge Batten originally granted the extension, he had no one to point out the cut-and-paste nature of the applications and that the three calls represented less than .01 percent of all calls on the wiretap. [*Id.*].

In response, the government first contends that SA Dixon detailed efforts made in the investigation, the inability to utilize certain methods, the impractical nature of such methods, and the difficulties inherent in this and similar investigations based in part on the affiant's own experience and training, and that of other investigators in this case. [Doc. 257 at 8]. Second, the government observes that Edwards relies almost exclusively on contentions that the agents relied on prior wiretap affidavits – using cut-and-paste, boilerplate assertions – without considering any other traditional investigative techniques, yet recurring facts and problems encountered during an investigation and repeated in various affidavits do not constitute "boilerplate" language.

5

[*Id.* at 9-10].  The government acknowledges that all of the Title III affidavits contain investigative facts that are general to this investigation and that are repeated in the fourteen affidavits, but it contends that the affidavit for the second extension also contains specific and particular facts to establish necessity at that stage of the investigation.  [*Id.* at 10].

Third, the government contends that Edwards's assertions ignore the facts that are updated within the second extension affidavit.  [*Id.* at 10].  The government notes the goals of the investigation as explained by SA Dixon, stating that these provide an important context for this Court's examination of the necessity issue because the investigation was much broader and ambitious than simply building a case against Edwards; rather, it was designed to reach to higher-level DTO members and spread out into diverse local channels of distribution, much of which was not known to the agents as of the date of the second extension affidavit.  [*Id.* at 10-12].  The government notes that the Eleventh Circuit and other circuit courts have considered such circumstances when examining a challenge to a showing of necessity.  [*Id.* at 12-13 (citing cases)].

Fourth, the government explains that SA Dixon described other investigative techniques that were considered but not used because they would not result in fruitful information, and many of these assertions were the same throughout the investigation

6

because the issues remained.  [*Id.* at 14].  The government notes that as of the date of

the second extension, many of the associates involved in the drug-related activities had

not been identified, so there were no witnesses to call into the grand jury, nor were

there potential cooperators (apart from historical ones) specific to the DTO.  [*Id.*].

Further, the government observes that SA Dixon noted that to approach witnesses at

that juncture or conduct searches of the locations would alert the organization while

only providing limited information.  [*Id.*].

Fifth, the government responds to Edwards's assertions regarding "boilerplate"

statements by noting that facts supporting the conclusion that alternative methods

would be less than effective in such large drug organizations would repeat themselves,

thus forming the basis of the necessity of the wiretap.  [*Id.* at 14-15].

Sixth, the government explains how the second extension affidavit is different

from previous affidavits, contending that Edwards's arguments overlook these

differences and the resulting effects on the necessity analysis.  [*Id.* at 15-16].  The

government notes that while some of the techniques described provided information

regarding certain associates, the techniques and the information gleaned therefrom did

not meet the goals of the investigation.  [*Id.* at 16].

AO 72A
(Rev.8/8
2)

Seventh, in response to Edwards's assertions that traditional investigative techniques had been successful and were therefore not exhausted, and that the goals of the investigation had been met and therefore were was no necessity to continue monitoring TT3, the government contends that all three of the affidavits for TT3 set out independently and in great detail the necessity for TT3 at the relevant time; the goals of the investigation, which had yet to be attained; the steps taken towards reaching those goals; the reasonable, good-faith efforts made to attain the goals; and the continuing necessity to seek authorization for TT3. [*Id.*].

Lastly, the government contends that even if the District Judge did not have a substantial basis to find necessity for the wiretap order, suppression of the evidence is not an appropriate remedy because the agents had a good-faith basis to believe the orders were valid. [*Id.* at 17]. The government asserts that the good-faith doctrine used in the Fourth Amendment context also applies to wiretap orders, [*id.* (citing *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988))], and Edwards has not argued that the agents who initiated the wiretap did not have a good-faith basis for believing that the underlying wiretap order was valid, [Doc. 257 at 18]. To the contrary, according to the government, the record establishes that the agents reasonably held such a belief, given the detailed affidavit presented. [*Id.*]. The government further

8

observes that while Edwards mentioned that Judge Batten was not made aware of the "cut and paste nature of the applications, and [had] no one to argue that the three calls represented less than .01 percent of all calls on the wiretap," Edwards has failed to establish that the affidavit contained inaccurate information or that any information was improperly withheld from the reviewing judge. [*Id.*].

In reply, Edwards first contends that each extension application (or supporting affidavit) must not only explain why the wiretap investigation was necessary in the first instance but also why the earlier wiretaps did not yield the expected results, yet the government has not addressed this additional level of necessity. [Doc. 265 at 3]. Instead, according to Edwards, the government cites to two paragraphs contained in the original affidavit as fulfilling the requirement and spends the rest of the response discussing why other investigative techniques failed. [*Id.*]. Edwards contends that because the government failed to answer this question and provide any reason for the necessity of the third extensions, it should be suppressed. [*Id.*].

Second, Edwards argues that while the government's brief implies that Edwards has the burden to show that the agents acted in bad faith, it is instead the government's burden to present facts allowing the Court to apply the good-faith exception, yet here, the government's sole argument was that the agents must have been acting in good faith

9

because they had a valid court order. [*Id.* at 3-4]. According to Edwards, this is circular logic because if applied in this manner the exception would swallow the rule: necessity would not truly be required because a wiretap could never be suppressed where an officer was executing a valid court order. [*Id.* at 4]. Further, Edwards emphasizes that the Supreme Court has stated in three cases that suppression is required where there is a failure to satisfy the statutory requirements of Title III. [*Id.*]. Because the statutory requirement of necessity was not met, states Edwards, the second extension for TT3 should be suppressed. [*Id.*].

### C.  Applicable Law

Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized, including the requirements for a wiretap application, 18 U.S.C. § 2518(1), the findings the district court must make, 18 U.S.C. § 2518(3), and requirements for the district court's authorization order, 18 U.S.C. § 2518(4). Title III contains its own exclusionary rule under which the defendant has standing to challenge the surveillance. 18 U.S.C. § 2518(10).

An "application must include a full and complete statement of the facts and circumstances . . . including (i) details as to the particular offense that has been, is

AO 72A
(Rev.8/8
2)

being, or is about to be committed." 18 U.S.C. § 2518(1)(b)(i). Thus, an application

for a wiretap authorization must be supported by the same probable cause necessary for

a search warrant. *United States v. Nixon,* 918 F.2d 895, 900 (11th Cir. 1990); *see also*

*United States v. Gonzalez-Perez*, 283 Fed. Appx. 716, 721 (11th Cir. June 24, 2008).

The issuing judge is to make a "practical, common-sense decision" about whether the

"totality of the circumstances" indicate that there is probable cause that the sought-for

evidence will be obtained. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A reviewing

court is "simply to ensure that the [judge] had a 'substantial basis for. . . conclud[ing]'

that probable cause existed." *Id.* at 238-39 (citation omitted). The practical nature of

the issuing judges' decision justifies "great deference" upon review and calls for

upholding those findings even in marginal or doubtful cases. *Nixon*, 918 F.2d at 900;

*United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982). Like other types of

warrants, probable cause must exist at the time surveillance is authorized. *United States*

*v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985).

An application for interception also must contain a full and complete statement

as to whether other investigative procedures have been tried and have failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c); *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir.

11

1986). "Full and complete" means a description with specificity as to why in this particular investigation ordinary means of investigation would fail or are too dangerous. *United States v. Weber*, 808 F.2d 1422 (11th Cir. 1987). The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. *Giordano*, 416 U.S. at 515; *United States v. Kahn*, 415 U.S. 143, 153, n.12 (1974). The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. *Van Horn*, 789 F.2d at 1496; *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978); *see also United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) ("The 'necessity' requirement in § 2518 ensures that law enforcement does not use electronic surveillance when less intrusive methods will suffice."); *United States v. Allen*, 416 Fed. Appx. 21, 26 (11th Cir. Jan. 31, 2011) ("The statute authorizing wiretaps is not intended 'to be routinely employed as the initial step in a criminal investigation,' . . . but rather, it is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.") (citation omitted). This does not, however, mean that the statute requires 'a comprehensive exhaustion of all possible

12

techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.' *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986)."). "Section 2518 does not 'foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted,' " *Perez*, 661 F.3d at 581 (quoting *Alonso*, 740 F.2d at 868, and *Hyde*, 574 F.2d at 867. However, the Government is required to show why alternative measures are inadequate for " 'this particular investigation.' " *Perez, id.* (quoting *United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991), and *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985)). The partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary. *Perez*, 661 F.3d at 581-82 (citing *United States v. Fernandez*, 388 F.3d 1199, 1236–37 (9th Cir. 2004), which concluded that government met "necessity" requirement despite "two confidential informants . . . [who] were able to provide significant information"); *see also United States v. De La Cruz Suarez*, 601 F.3d 1210, 1214 n.7 (11th Cir. 2010) (finding that the "necessity" requirement was met despite government's use of confidential informants and consensual monitoring).

13

AO 72A
(Rev.8/8
2)

Finally, the good-faith exception to the exclusionary rule applies to considerations of wiretap warrants. *See Malekzadeh*, 855 F.2d at 1497.[1]

## D. Analysis

The undersigned concludes that these requirements have been satisfied here. SA Dixon's affidavit for the second extension adequately discusses the need for the interception and explains why some alternative techniques would be not appropriate in this investigation. (SA Dixon's Aff. ¶¶ 26-29, 35-78). Notably, Edwards does not appear to contest the probable-cause basis for the interception, [*see* Doc. 152 at 5-7], nor does he appear to contest the sufficiency of the affidavit's explanation of the lack of utility of alternative techniques, apart from an assertion that much of the language in the affidavit is copy-pasted from earlier affidavits, [*id.* at 6-7], which is not an attack on accuracy of the statements themselves.

Rather, Edwards's primary objection appears to be what he believes to be a failure to satisfy the statutory requirements of Title III, which he says mandates suppression under *Giordano*. Specifically, he contends that the government has failed

---

[1] Because Edwards does not contest that the Eleventh Circuit has applied the good-faith exception to wiretaps, [*see* Doc. 265 at 11], the undersigned need not address Edwards arguments that it is inappropriate to apply the good-faith exception to Title III, [*see id.* at 10-13], given that it invites the undersigned to ignore binding Eleventh Circuit precedent interpreting Supreme Court precedent and Title III.

14

to satisfy § 2518(1)(f), which requires "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results," 18 U.S.C. § 2518(1)(f).  [Doc. 152 at 5-7; Doc. 265 at 2-3].  Unhelpfully, the government does not address this provision in its response, [*see* Doc. 257], but it is not clear how § 2518(1)(f) is not satisfied by SA Dixon's affidavit.  The statute is written in the disjunctive: the government must either set forth "the results thus far obtained from the interception," *or* the government must provide "a reasonable explanation of the failure to obtain such results."  18 U.S.C. § 2518(1)(f).  Here, SA Dixon's affidavit discusses three calls that were intercepted on TT3 between the filing of the first extension affidavit (from Task Force Officer Gordon) and the affidavit at issue in this motion (SA Dixon's affidavit).  (See SA Dixon's Aff. ¶¶ 18-20).  Because the government set forth these results, it was not required to explain its failure to obtain any other results.  It may not have obtained the results it desired, but that is the very basis for the extension, and the affidavit explains the reasons why the information is needed.  *Cf. United States v. Swinburne*, 988 F.2d 125 (9th Cir. 1993) (Table) (finding compliance with § 2518(1)(f) where extension affidavit noted results achieved through prior interceptions).

15

As noted above and asserted vigorously by Edwards, many of the statements from the second extension affidavit are identical to those from the first extension affidavit, but that simply suggests that problems posed earlier in the investigation remain true, and Edwards has made no showing that these representations are inaccurate or were recklessly made. Under these circumstances, and given the lack of any probable-cause challenge, the undersigned finds that Edwards has not established grounds to suppress the intercepts on TT3. The undersigned therefore **RECOMMENDS** that Edwards's motion to suppress be **DENIED** with respect to Target Telephone 3.

Even were the undersigned to conclude, despite Edwards not so contending, that there was no substantial basis for concluding that probable cause existed, the undersigned would nevertheless find that the good-faith exception applied. Pursuant to the good-faith exception, "courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause. *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). This good-faith exception applies in all but four circumstances: (1) "where the magistrate or judge in issuing a warrant was misled by information in an affidavit that

16

the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role"; (3) "where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "where, depending upon the circumstances of the particular case, a warrant is so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Martin*, *id.* (citation and internal quotation marks omitted). None of these appears to apply here, and therefore the good-faith exception would apply to TT3 even in the event that the Court concluded that there was no substantial basis for the issuing judge to conclude that probable cause existed.[2]

## II.     Target Telephone 8 – Sealing Requirement

The undersigned need not discuss the arguments of the parties regarding Target Telephone 8: in his reply brief, Edwards withdraws his challenge to the wiretap on

---

[2]      Edwards contends that if the good-faith exception were to apply here because of a valid court order, the exception would swallow the rule, and necessity would never be required because a wiretap could never be suppressed where an officer was executing a valid court order. [Doc. 265 at 3-4]. Whatever the merits of this argument, the Court is not permitted to ignore Eleventh Circuit precedent dictating the circumstances in which the good-faith exception does not apply.

AO 72A
(Rev.8/8
2)

Target Telephone 8 for sealing violations. [Doc. 265 at 5]. The undersigned therefore **RECOMMENDS** that Edwards's motion to suppress with respect to Target Telephone 8 be **DENIED AS WITHDRAWN**.

## III.    Target Telephone 9 – Minimization Requirement

### A.    Arguments of the Parties

In his motion to suppress, Edwards first notes the government's burden of showing that it conducted the electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." [Doc. 152 at 10 (quoting 18 U.S.C. 2518(5))]. Edwards then observes that the summary detail line sheet provided by the government show that out of 6,192 sessions, 3,606 calls were completed, only 1,547 were pertinent, and only 45 calls were minimized – or 1.2% of all calls – leaving 2,014 calls that were deemed irrelevant but nevertheless listened to by agents. [Doc. 152 at 11]. Edwards lists 23 of these calls (and attaches them as Exhibit C) that lasted over two minutes but that were not pertinent and were not minimized. [*Id.*]. According to Edwards, the government's normal response would be that agents need to listen to these calls to determine the code words that a particular drug organization is using, but this wiretap was the fourteenth wiretap in the investigation, so the agents had many months to develop an understanding of the code

used, and thus the agents' failure to minimize and spot-check these calls was an invasion of Edwards's right to privacy. [*Id.* at 11-12]. Edwards argues that because 98.8% of the calls were not minimized or spot-checked, and because calls labeled non-pertinent were listened to in their entirety, there can be no rational argument that the government has met their minimization burden, and thus the contents of the wiretap on Target Telephone 9 ("TT9") should be suppressed. [*Id.* at 12].

In response, the government first contends that a court will identify a minimization claim if: (1) the supervising attorney circulates a memorandum fully setting forth instructions that were consistent with minimization requirements, (2) the attorney holds a meeting with the monitors to orally discuss minimization procedures and rules, (3) the attorney submits a progress report to the court that includes information about minimization of telephone calls; and (4) the agents use the "two minutes up/one minute down" minimization technique recommended by the Department of Justice Manual. [Doc. 257 at 23 (citing *Malekzadeh*, 855 F.2d at 1495; *United States v. Smith*, 909 F.2d 1164, 1166 (8th Cir. 1990); *United States v. Daly*, 535 F.2d 434, 441-42 (8th Cir. 1976))]. According to the government, all of this was done: agents were instructed, both orally and in writing, on the process of minimization prior to intercepting any calls; agents were instructed on and used the two-minutes-up,

AO 72A
(Rev.8/8
2)

one-minute-down procedure; and the government provided a fifteen-day report updating the Court on the progress of the interception and investigation, including a print-out of the call categorization. [Doc. 257 at 24]. The government also contends that the agents showed a high regard for the privacy of the interceptees. [*Id.*].

Second, the government observes that the interception of TT9 came about six months after the authorization for the first wiretap, and it was only the seventh wiretap in a total of fourteen authorized wiretaps. [*Id.* at 24-25]. Third, the government notes that TT9 was a push-to-talk phone, which inflates the number of calls intercepted because a push-to-talk "conversation" is actually made up of numerous sessions, each of which is registered as a separate call. [*Id.* at 25].

Fourth, the government disputes Edwards's "math" with respect to the minimized calls. [*Id.* at 25-26]. Specifically, with respect to Edwards's claim that only 1.2% of the calls intercepted for TT9 were minimized, the government states the following: (1) of the 6,192 calls, 5,922 calls were two minutes or less, representing 95% of the total calls; (2) "the instructions, case law, and the reality of interception" dictate that calls that are two minutes or less are generally not long enough to minimize (citing *De La Cruz Suarez*, 601 F.3d at 1215); (3) after 30 days, only 83 calls that were over two minutes were not minimized, meaning 0.01% of the total calls may not have been

properly minimized; and (4) only 333 calls were over two minutes (5% of the total calls), and 250 were deemed pertinent, leaving the 83 calls that were over two minutes and not minimized. [Doc. 257 at 25-26]. The government contends that in reviewing the list of calls cited by Edwards in his brief, there are numerous explanations as to why a call was not minimized: some were discussing drug-related assets, and others appeared to be discussing drug-related activity. [*Id.* at 26 (citing the 23 calls cited by Edwards)]. The government states further that for almost all of these calls, the agents/monitors were required to listen to the call in its entirety before they could determine its status. [*Id.*].

Finally, the government argues that if there are instances of improper suppression, the remedy is suppression of the call that should have been minimized, not all of the calls that were intercepted. [*Id.* at 26-27 (citing cases from the First, Second, and Eighth Circuits)]. The government contends that Edwards cannot show bad faith on the part of the agents and monitors in their minimization practices, and thus the motion should be denied. [*Id.* at 27].

In reply, Edwards first contends that the government misstates the applicable law. [Doc. 265 at 5-8]. Edwards quotes the government's four-factor test for denying a minimization claim and states that the cases cited by the government – *Malekzadeh*

AO 72A
(Rev.8/8
2)

(11th Cir.), *Smith* (8th Cir.), and *Daly* (8th Cir.) – do not support the government's point. [Doc. 265 at 5-8]. According to Edwards, *Malekzadeh* was essentially about the marital privilege, not minimization, and no reference was made to any of the factors mentioned by the government. [*Id.* at 6]. Next, Edwards addresses the *Smith* case, saying that the court there found that Smith's assertions that the call should have been minimized was wrong based on the reasonableness of the officers' actions, not the fact that a memorandum was issued regarding minimization guidelines, as the government in this case suggests. [*Id.* at 6-7]. Lastly with respect to this first issue, Edwards states that *Daly* does not stand for the notion that minimization is met where judicial supervision is present, but rather that courts have been more willing to find that monitors engaged in good-faith minimization where a judge has required interim reports showing what progress has been made with respect to a wiretap. [*Id.* at 7-8]. Edwards states that the *Daly* Court used a reasonableness standard, a standard that encompasses several factors, including the scope of the enterprise, the government's reasonable expectation of the calls' content, and the continued judicial supervision of the authorizing judge. [*Id.* at 7].

Second, Edwards argues in his reply that the government failed to prove that the interception of over 23 non-pertinent calls lasting longer than two minutes was

22

AO 72A
(Rev.8/8
2)

reasonable. [*Id.* at 8-9]. According to Edwards, the government contended that there "are numerous explanations" but failed to identify any of them, meaning there is no way to know whether it was reasonable that they were not minimized. [*Id.* at 8]. Edwards further states that the assertion that the agents needed to listen to the calls in their entirety to determine their pertinency directly contradicts the two-minutes-up, one-minute-down technique. [*Id.*]. In sum, Edwards states that the government has failed to prove compliance with the minimization requirements, and that the government's misstatement of law and broad statement that "there are numerous explanations" does not meet this burden. [*Id.* at 9].

Third, Edwards argues that the appropriate remedy for failure to properly minimize is suppression of the entire wiretap. [*Id.* at 9-10]. In particular, he states that the government's suggestion to suppress only those calls that are non-incriminating would afford a defendant no real remedy because only those conversations that the prosecutor had no intention of using against him would be suppressed, which would also serve to strip the minimizing provision of all deterrent effect, eliminating the protections that Congress instituted and making Title III unconstitutional. [*Id.* at 9-10 (citing *United States v. Focarile*, 340 F. Supp. 1033, 1046 (D. Md. 1972); *United States*

23

*v. Giordano*, 469 F.2d 522 (4th Cir. 1972), *rev'd on other grounds*, 416 U.S. 505 (1974), *quoted with approval in United States Principie*, 531 F.2d 1132, 1140 (2d Cir. 1976))].

### B.     Applicable Law

Electronic surveillance must be conducted in such a way so as to minimize the interception of communications not otherwise subject to interception. 18 U.S.C. § 2518(5). In considering challenges to the government's minimization, the court must make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time. *Scott v. United States*, 436 U.S. 128 (1978). The wiretap statute does not prohibit the interception of all non-relevant conversations, but rather instructs law enforcement to conduct the surveillance in such a manner as to minimize the interception of such conversations. The standard is one of reasonableness. *United States v. Moody*, 977 F.2d 1425, 1433 (11th Cir. 1992).[3] Conversations lasting less than two minutes are considered too brief "to identify the caller and characterize the conversation as merely social or possibly tainted." *De La Cruz Suarez*, 601 F.3d at 1215 (quoting *United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973)).

---

[3]     The undersigned agrees with Edwards, [Doc. 265 at 5-6], that it is not clear from where the government derives its four-factor test regarding minimization claims. The cases cited do not appear to support the government's test as stated.

AO 72A
(Rev.8/8
2)

## C.    Analysis

The motion to suppress with respect to TT9 should be denied.  Because of Eleventh Circuit precedent indicating that calls lasting fewer than two minutes are too brief "to identify the caller and characterize the conversation as merely social or possibly tainted," *De La Cruz Suarez*, 601 F.3d at 1215 – the implication being that such calls do not generally need to be minimized – the vast majority of the 6,192 sessions need not be discussed with respect to minimization.  For this reason, Edwards's complaint that 98.8% of the calls were not minimized is not particularly relevant, by itself.  *See id.* ("Evidence that a small number of calls were minimized does not, by itself, indicate that the minimization procedures used by the government were unreasonable.").  In light of *De La Cruz Suarez*, it is perhaps no surprise that Edwards ultimately focuses predominantly on 23 calls lasting over two minutes that were not pertinent and not minimized.  [*See* Doc. 152 at 11].  The undersigned therefore turns to those calls.

The undersigned concludes that the government acted reasonably to minimize the number of innocent conversations monitored.  The agents and monitors were instructed on minimization procedures, (*see* Govt. Exhibit, "Instructions for Wire Interception"), including instructions encompassing the two-minutes-up, one-minute

25

down procedure, (*see id.* ¶ 12). Further, the government provided to the Court a report on intercepted calls covering the first fifteen days of the thirty-day period of interception, (*see* Govt. Exhibit, "Fifteen-Day Report to the Court"), a factor that the Eighth Circuit in *Daly* found relevant to the reasonableness analysis, 535 F.2d at 441-42, *cited in United States v. Yarbrough*, 527 F.3d 1092, 1098 (10th Cir. 2008), as Edwards notes, [Doc. 265 at 7-8]. Regardless of the role the fifteen-day report fits into the reasonableness analysis, however, the undersigned concludes that the minimization instructions and the calls themselves suggest that a finding of a failure to minimize is unwarranted here. The undersigned has reviewed the line sheet summaries of the calls, has listened to portions of each of the 23 calls cited, and has determined that while some of them could reasonably have been ended earlier, many of them would have required a substantial amount of time to determine their pertinency.[4] Stated another way, the government was not unambiguously correct in stating that "almost all" of the calls required the agents or monitors to listen to the call in its entirety before determinating its pertinency, [Doc. 257 at 26], but the government was certainly right that many of the calls initially appeared to concern drug-related activity or assets, [*id.*].

_____

[4]    The undersigned notes that the apparently push-to-talk nature of most of the calls – resulting in longer periods of silence than would exist in a standard telephone conversation – also contributed to their length.

AO 72A
(Rev.8/8
2)

While the undersigned believes that it would not have been necessary for the agents or monitors to listen to the entirety of all the calls, this does not compel a conclusion that there was a failure to minimize. *See United States v. Ortega-Estrada*, Criminal File No. 1:07-CR-356-TWT, 2008 WL 4716949, at *9 (N.D. Ga. Oct. 22, 2008) (Thrash, J., adopting Hagy, J.) ("[A] determination of whether minimization requirements were met requires a reasonableness determination not just with respect to one particular call, but to the conduct of the entire wiretap in question. If, with hindsight, a court may think that some intercepts may have gone on longer than necessary, that would not be conclusive. The statute does not make unlawful the interception of any innocent calls, it only instructs that the Government act reasonably to minimize the number of innocent conversations that are monitored."); *see also United States v. Cox*, 462 F.2d 1293, 1300-1301 (8th Cir. 1972) ("[W]here, as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls . . . does not constitute failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.") (first alteration added), *cited in Ortega-Estrada*, *id.*

AO 72A
(Rev.8/8
2)

For all these reasons, the undersigned concludes that no failure to minimize occurred. The undersigned therefore **RECOMMENDS** that Edwards's motion to suppress be **DENIED** with respect to Target Telephone 9.

## V.     Edwards's Request for a Hearing

In the prayer for relief of his motion to suppress, Edwards requests an evidentiary hearing on the motion. [Doc. 152 at 12]. The government opposes the request, stating that the affidavits and evidence before the Court are sufficient on their face to permit the Court to rule on the motion. [Doc. 257 at 27-28]. As the government notes, [*id.* at 27], "the court has discretion in determining the need for a hearing," *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). The undersigned concludes that an evidentiary hearing on this motion would serve no useful purpose because, for the reasons outlined in the discussion above, Edwards's arguments are without merit. The undersigned therefore **RECOMMENDS** that the District Court **DECLINE** to grant an evidentiary hearing.

## VI.     Conclusion

For the reasons above, the undersigned **RECOMMENDS** that Edwards's request for an evidentiary hearing be **DENIED**, and that his motion to suppress be **DENIED**

28

AO 72A
(Rev.8/8
2)

as to Target Telephone 3, **DENIED AS WITHDRAWN** as to Target Telephone 8, and

**DENIED** as to Target Telephone 9.  [Doc. 152].

The Court has now ruled on all of this defendant's pretrial motions.  As a result,

the case is **CERTIFIED READY FOR TRIAL AS TO THIS DEFENDANT**.

**IT IS SO RECOMMENDED, ORDERED and CERTIFIED**, this the 2d day

of February, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)